# IN THE UNITED STATES COURT OF APPEALS
## FOR THE TENTH CIRCUIT

| | | |
|---|---|---|
| MARY C. VERNON, | ) | |
| Defendant/Appellant | ) | |
| | ) | Appeal No.  14-3279 |
| v. | ) | |
| | ) | |
| UNITED STATES | ) | |
| Plaintiff/Appellee | ) | |

On Appeal from the United States District Court
for the District of Kansas, at Kansas City
The Honorable William Paul Johnson
Case No. 12-CR-20160-WPJ

## AMENDED REPLY BRIEF OF APPELLANT
## MARY C. VERNON

Respectfully submitted,

Floyd R. Finch, Jr.   KS. Bar # 16993
Floyd Finch Law Offices
24211 E. Strode Rd.
Blue Springs, MO   64015
816-560-1234
ffinch@kcbusinesstriallawyers.com

Attorney for Appellant

**Oral Argument Is Requested**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .......................................................................... iii

ARGUMENT ............................................................................................. 1

**I.   The District Court violated Defendant's Due Process rights by denying Defendant's Motion for Judgment of Acquittal and by entering Judgment on a conviction for tax evasion based on theories from civil tax collection case law that are both misstated by the prosecution and not stated in a criminal statute passed by Congress and signed by the President.  The Government's Brief compounds this error by advancing yet another theory not in the instructions in an attempt to sustain the conviction.** ................................................ 1

**A.   The Government's newest theory—not presented in the jury instructions—requires a finding that defendant "anticipatorily assigned her income" to a subchapter S corporation that wasn't a "sham" when it was formed, but became a "sham" at some later unspecified point. Defendant did not have fair notice that this *ad hoc* concoction of theories could be a crime.** ........................................... 2

**B.   Because RMS was not "a sham" under Kansas law, and Kansas does not authorize an "alter ego" finding against a person who is not an officer, director, or shareholder, the tax evasion statute does not provide fair notice to defendant that her conduct could be criminal.** .............. 10

**II.   The Trial Court erred in denying Defendant's motion for acquittal and in entering Judgment on a theory of tax evasion that could not have been known by the taxpayer and was not proved under Kansas law, and when the prosecution did not offer evidence that Mary Vernon knew that misapplication of civil tax collection doctrines developed in case law would be applied to her conduct.** .............. 20

**III.  The Trial Court erred in instructing the jury with misstatements of civil tax collection doctrines that were not accurate statements of the law and were not clearly related by the Court to the tax evasion charges alleged in the indictment.  The instructions as a whole create substantial doubt that the jury was fairly guided and it is likely that the jury applied the instructions in an unconstitutional manner ....... 20**

**IV.  The Trial Court erred in its sentencing calculation by allowing the prosecution to ignore the legal existence of Rockledge Medical Services, Inc., and to allocate 100% of the net income of RMS and all of the tax on that income to defendant when her same-sex significant other Sara Wentz enjoyed the benefits of the arrangement; to claim $988,522.76 as "Tax Loss" when defendant had paid in full all of her previous tax liability with full interest and penalties more than five years before the indictment was returned; and to employ a "sophisticated means" enhancement when the "Sham Corporation" doctrine does not apply under Kansas law. .......................................................... 23**

CONCLUSION .............................................................. 24

FED. R. APP. P. 32(A)(7)(C) CERTIFICATE OF COMPLIANCE ........... 26

CERTIFICATE OF SERVICE ..................................................... 27

Appellate Case: 14-3279   Document: 01019524937   Date Filed: 11/17/2015   Page: 4

# Table of Authorities

<u>Cases:</u>

*Amoco Chemicals Corp. v. Bach,* 567 P.2d 1337 (Kan. 1977). . 14, 15, 17, 22

*Aquilino v. U.S.*  363 U.S. 509 (1960). ....................................................... 12

*Bollore SA v. Import Warehouse Inc.*, 448 F.3d 317 (5th Cir 2006), ........... 16

E*quity Trust Co. Custodian ex rel. Eisenmenger IRA v.Cole,* 766 N.W.2d 334 (Minn. Ct. App. 2009). ........................................................................ 13

*Fogelsong v. Comm'r* , 621 F.2d 865 (7th Cir. 1980). ..................................... 4

*Johnson v. Comm'r*, 78 TC 882 (1982). .......................................................... 4

*Johnson v. U.S.,* 2015 WL 2473450 (June 26 , 2015) ................ …1, 7, 9, 16

*Keller v. Comm'r*, 77 T.C. 1014 (1981), *aff'd*, 723 F.2d 58 (10th Cir. 1983) ... .................................................................................................................. 4, 11, 22

*Kilpatrick Bros., Inc. v. Poynter,* 473 P.2d 33 (Kan. 1970). ...................... 15

*Kirk v. H.G.P. Corp.,* 494 P.2d 1087 (Kan. 1972). .................................... 15

*Lucas v. Earl,* 281 U.S. 111 (1930) .............................. ………………… 4, 5

*McCallum Family LLC v. Winger,* 221 P.3d 69, 75 (Colo. App. 2009)....... 13

*.McCulloch Gas Transmission Co. v. Ks.-Neb. Nat. Gas Co.,* 768 F.2d 1199 (10th Cir. 1985)............................................................................................. 12

*Moline Props., Inc., v. Comm'r*, 319 U.S. 436 (1943). ................................... 4

*Perpetual Real Estate Servs., Inc., v. Michaelson Props., Inc.*, 974 F.2d 545 (4th Cir. 1992). .................................................................................... 12, 22

*Schneer v. Comm'r*, 97 T.C. 643 (1991). ............................ …………4, 5, 22

*Serv. Iron Foundry, Inc. v. M.A. Bell Co.,* 588 463, (Kan. Ct. App. 1978).  13

*U.S. v. Newell*, 239 F.3d 917 (7th Cir. 2001).  ............................................. 8, 9

*U.S. v. Scherping,* 187 F.3d 796 (8th Cir. 1999).  .................................... 12, 13


 Other Authorities:

Boris I. Bittker, Federal Income Taxation and the Family, 27 Stan. L. Rev. 1389, 1401 (1975).  ..........................................................................................4

Marvin A. Chirelstein, Federal Income Taxation:  A Law Student's Guide to the Leading Cases and Concepts ¶ 8.05, at 191-92 (6th ed. 1991). .................4

Fletcher Cyclopedia of the Law of Corporations ........................................ 12
12
Ronald H. Jensen, Schneer v. Commissioner:  Continuing Confusion over the Assignment of Income Doctrine and Personal Service Income, 1 FLA. TAX. REV. 623, 624, 627 (1993)
http://digitalcommons.pace.edu/cgi/viewcontent.cgi?article=1505&context=lawfaculty. ....................................................................................... 2, 3, 6, 7

Robert D. Stewart, I Am the Master(s) of My Fate: Owen v. Commissioner and the Assignment of Income Doctrine in the Context of Personal Service Corporations, 67 Tax Law. 379 (ABA 2013) at 16. .......................................3

Appellate Case: 14-3279   Document: 01019524937   Date Filed: 11/17/2015   Page: 6

# ARGUMENT

## I.  The District Court violated Mary Vernon's Due Process rights by denying her Motion for Judgment of Acquittal and by entering Judgment on a conviction for tax evasion based on theories from civil tax collection case law that are both misstated by the prosecution and not stated in a criminal statute passed by Congress and signed by the President.  The Government's Brief compounds this error by advancing yet another theory not in the instructions in an attempt to sustain the conviction.

On June 26, 2015, the Supreme Court ruled once again that the government violates due process when it takes away someone's liberty or property under a criminal law so vague that it fails to give ordinary people fair notice of the conduct it punishes or so standardless that it invites arbitrary enforcement.  *Johnson v. U.S.*, 2015 WL 2473450 (June 26, 2015) at *4.  In an opinion authored by Justice Scalia, six Justices voted to hold that an increased sentence under the residual clause of the Armed Career Criminal Act violates due process (*id.* at *11) because it is so vague that "the indeterminacy of the wide-ranging inquiry required by the residual clause both denies fair notice to defendants and invites arbitrary enforcement by judges." *Id.* at 9.[1]

The prosecution's attempt to apply the tax evasion statute to Mary Vernon by throwing against the courtroom wall various theories to see what might stick suffered from the same vice.  Despite the government's declaration that "defendant had fair notice under well-settled tax law that her conduct was illegal," Appellee's

---

[1] Justices Kennedy and Thomas concurred, with only Justice Alito in dissent.  *Id.* at *11, *21.

Appellate Case: 14-3279     Document: 01019524937     Date Filed: 11/17/2015     Page: 7

Brief at 16 n.7, the fact that the prosecution has to rely on a smorgasbord of

theories drawn from civil tax collection case law prove that there is no coherent

theory that would have put Dr. Vernon on notice in 2003 that volunteering her time

to a subchapter S corporation owned and controlled by its sole officer and director,

her same-sex significant other[2]—as that corporation was recommended by an

experienced tax and corporate lawyer—could be tax evasion.

**A. The Government's newest theory presented in Appellee's Brief— and not presented in the jury instructions—requires a finding that Mary Vernon "anticipatorily assigned her income" to a subchapter S corporation that wasn't a "sham" when it was formed, but became a "sham" at some later unspecified point. Dr. Vernon did not have fair notice that this *ad hoc* concoction of theories could be a crime.**

The first substantive point in Appellee's Brief appears under the heading

"The Applicable Tax Law is Well Settled."  Appellee's Brief at 19.  There the

government mushes together the concepts of "assignment of income"—which was

barely mentioned in the trial court's instructions—with "*anticipatory* assignment

of income," a theory not mentioned in the Court's instructions and barely

mentioned at trial.

---

[2] Mary Vernon and her significant other Sara Wentz were not and could not have been married under Kansas law at the time of the events alleged in the indictment, and the federal Defense of Marriage Act forbade recognition of their relationship.  Accordingly, notions of 'related parties,' and 'control' the IRS has applied to married persons would be inapplicable here.  Ms. Wentz testified at trial that she was never under the control of Mary Vernon.  APLT 1791:17-1972:4.

Appellate Case: 14-3279     Document: 01019524937     Date Filed: 11/17/2015     Page: 8

The government's confusion is understandable.  *See* Ronald H. Jenson, Schneer v. Commissioner:  Continuing Confusion over the Assignment of Income Doctrine and Personal Service Income, 1 FLA. TAX. REV. 623, 624, 627 (1993)("[D]espite its venerable lineage and importance, the [assignment of income] doctrine remains today beset by confusion and uncertainty," and finding that "the courts and the Internal Revenue Service … have produced a collection of irreconcilable and inexplicable cases and rulings.")[3]  What is remarkable is the prosecution's suggestion that a busy physician like Mary Vernon should have understood these concepts better than the prosecution did.

It is undisputed that the sequence was:  Mary Vernon received advice from competent counsel who testified that Dr. Vernon did not ask for help in evading taxes, and that the attorney would not have participated in evasion of taxes. APLT 998:9-20; 1005:2-5; 1020:8-14.  The attorney knew the purpose of setting up the subchapter S corporation Rockledge Medical Services, Inc. ("RMS") was to contract with businesses which wanted Mary Vernon to provide certain services; the corporation was created with Sara Wentz as sole stockholder, sole officer, and sole director; Ms. Wentz signed the contracts between RMS and various

---

[3] Available at
http://digitalcommons.pace.edu/cgi/viewcontent.cgi?article=1505&context=lawfaculty.
*See also* Robert D. Stewart, I Am the Master(s) of My Fate: Owen v. Commissioner and the Assignment of Income Doctrine in the Context of Personal Service Corporations, 67 Tax Law. 379 (ABA 2013) at 16 (referring to "the doctrinal morass surrounding the assignment of income doctrine with regard to" personal service corporations.).

businesses; and RMS accepted the duty to provide services from Mary Vernon.  Dr.
Vernon contends this was not an illegal assignment of income.  Rather, it was a
common corporate transaction in which the revenue paid by the contracting parties
to RMS was income to RMS, which flowed through to the tax return of its sole
owner, officer, and director Sara Wentz.  To use the analogy coined by Justice
Holmes, RMS sold a tree to Atkins and the other companies, then received
payment for the fruit that tree generated.

The government's facile reliance on *Lucas v. Earl*, 281 U.S. 111, 114
(1930),[4] to argue that "the law is well-settled" ignores the case law addressing the
"tension [that] has evolved between the basic tenets of *Lucas v. Earl* and
recognition of the nature of the corporate business form."  *Johnson v. Comm'r*, 78
TC 882, 890 (1982), *aff'd without published opinion, 734 F.2d 20 (9th Cir. 1984)*,
*quoted in Schneer v. Comm'r*, 97 T.C. 643, 659 (1991).[5]  "Thus, an employee of a

---

[4] One professor described "[t]he opinion in Lucas v. Earl [as] late-vintage Holmes,
magisterial in tone, studded with quotable phrases, and devoid of analysis."  Boris I. Bittker,
Federal Income Taxation and the Family, 27 Stan. L. Rev. 1389, 1401 (1975)(footnote
omitted).  Another described the Supreme Court's opinions on the topic as "over-long and
confusing" as the Court avoided "directly admitting that it was engaged in judicial law-
making."  Marvin A. Chirelstein, Federal Income Taxation:  A Law Student's Guide to the
Leading Cases and Concepts ¶ 8.05, at 191-92 (6th ed. 1991).

[5] The Tax Court also cited *Fogelsong v. Comm'r*, 621 F.2d 865 (7th Cir. 1980)(a case upon
which defendant also has relied); *Keller v. Comm'r*, 77 T.C. 1014, 1031 (1981), *aff'd*, 723
F.2d 58 (10th Cir. 1983); and *Moline Props., Inc., v. Comm'r*, 319 U.S. 436 (1943).  *Keller*
contradicts the government's implicit assumption that "assignment [or anticipatory
assignment] of income" in inherently a fraud on the IRS invalidating the corporate entity.
"Whether the purpose [of incorporating] be to gain an advantage under the law of the state
of incorporation or to avoid or to comply with the demands of creditors or to serve the

personal service corporation, or other corporate entity, is outside the holding of *Lucas v. Earl, supra,* to some degree because of the 'entity concept.' The business entity is cast as the earner of the income, obviating the need to analyze whether there has been an assignment of income." *Schneer*, 97 T.C. at 660.

The Tax Court continued its analysis in a footnote: "It should be noted that in all these cases, the assignment to the corporation was of income not yet earned. That is, in situations where the entity was validly cast as the earner of the income, the factual pattern involved an incorporation and subsequent earnings by the incorporator." *Id.* n.11.[6]

That's what happened here—RMS was incorporated; it entered into contracts requiring it to provide Mary Vernon to do work for the contracting parties; that work was performed; and then RMS was paid pursuant to the contracts. Those payments were not Mary Vernon's "income" as the prosecution insisted so adamantly. The income belonged to RMS, the subchapter S corporation, and the

---

creator's personal or undisclosed convenience, so long as that purpose is the equivalent of business activity or is followed by the carrying on of business by the corporation, the corporation remains a separate taxable entity" (referring to a C corporation). 77 T.C. at 1030. "The policy favoring the recognition of corporations as entities independent of their shareholders requires that we not ignore the corporate form so long as the corporation actually conducts business." *Id.* at 1031, *citing Moline Props., Inc., v. Comm'r,* 319 U.S. 436, 438-39 (1943).

[6] Following the analogy of this personal services corporation doctrine, the Tax Court in *Schneer* held that income contractually assigned to a subsequent partnership but not yet earned at the time of the assignment was taxable to the subsequent partnership. 97 T.C. at 663.

taxes were to be paid by Ms. Wentz, its sole shareholder. Definitionally, what happened here is not "assignment of income" governed by *Lucas v. Earl*.

One commentator has described this as "the agency test," which "works in a highly mechanistic manner: if a contract or agreement exists between the employer [Atkins, for example] and a third party [RMS] under which the third party [RMS] provides the services of the employee [Vernon] to the employer [Atkins], the employee will be treated as the third-party's agent." Jenson, *supra,* 1 FLA. TAX. REV. at 647.[7]

In this case, RMS entered into contracts with Atkins to provide writing and speaking by Mary Vernon. In the Atkins contracts, Sara Wentz signed as President of RMS, and Dr. Vernon signed the contracts as "Adviser" to provide those services, with RMS to be paid. APLT 2903-11, 2912-20. RMS also entered into contracts with nursing homes and extended care facilities to provide Dr. Vernon's work as medical director. APLT 2921-25, 2927-38, 2949-55. Those companies then paid RMS pursuant to the contracts. APLT 2788, 2808-09, 2849, 2883. Under the agency test, therefore, the money paid to the subchapter S corporation RMS was not "*her* income," as the prosecution is so fond of saying. Instead it was

---

[7]The commentator finds "[t]here are many difficulties with the agency tests as applied by the Service and the courts. First, they are irreconcilable with many of the Service's own rulings." 1 FLA .TAX. REV. at 651. He further notes "[t]he striking divergence in the Service's treatment of seemingly similar cases...." *Id.* at 652. These factors demonstrate the opportunity for arbitrariness that the Supreme Court condemns in *Johnson v. U.S., supra*, making the "assignment of income" doctrine developed in civil cases particularly inappropriate to enforce by criminal prosecution.

RMS' income, properly reportable to the Internal Revenue Service by RMS, and taxable to its sole shareholder Sara Wentz, who should have both reported the subchapter S income and paid taxes on it pursuant to the agency test.  APLT 2658, 2884-86; APLT 928:6-9.

Note that in 2003 and 2008 RMS did report its income to the Internal Revenue Service, and Ms. Wentz did properly report the RMS income as her own, in accordance with the agency test.  APLT 2741 and 2743.  But the prosecution labeled the 2003 Wentz and RMS returns "prior bad acts" attributable to Mary Vernon and the 2008 Wentz and RMS returns as "affirmative acts of evasion" caused by Dr. Vernon.

One commentator concluded that the agency test adopted by the courts "provide[s] no intelligible reason for applying or not applying the assignment of income doctrine." Jenson, *supra,* 1 FLA .TAX. REV. at 656. Thus, the uncertainty of application of the common law "assignment of income" doctrine to tax evasion parallels the uncertainty of the standards to be applied to the residual clause of the ACCA condemned by the Supreme Court in *Johnson v. U.S,* depriving defendant of fair notice that her conduct would be criminal.  These doctrines are not as clear and settled as the government would have the Court believe. Therefore the "assignment of income" doctrine as applied in this case cannot authorize conviction for tax evasion without violating due process.

It is unrealistic to suggest that Dr. Vernon should have second-guessed the advice provided by an attorney specializing in tax and corporate organizations and abandoned her busy medical practice to try to research this esoteric area of tax law. The assignment of income theory was far too uncertain to provide notice to Dr. Vernon that she was committing a crime, and to justify a criminal prosecution.

The only criminal tax case the government cites on its "anticipatory assignment of income" theory is *U.S. v. Newell*, 239 F.3d 917, 920 (7th Cir. 2001). In that case defendant Newell, a commodities trader who owned 50% of a subchapter S corporation named LPM Inc. became "irate that the Clinton Administration was planning to increase federal income tax rates for higher earners like himself." *Id.* at 919. Defendant Newell created a new Bermuda corporation (LPM Ltd.) "to which he planned to funnel income that would otherwise be received by" the subchapter S corporation. *Id*. The Bermuda corporation "was to be 'a nameplate on the door,' 'a dummy corporation'; 'it wasn't going to do anything except receive income intended for" the subchapter S corporation. *Id.*

The Abu Dhabi Investment Authority was a client of the subchapter S corporation LPM Inc., and owed the S corporation $1.3 million for services provided and invoiced by the S corporation in 1993. *Id.* The defendant directed

Appellate Case: 14-3279   Document: 01019524593   Date Filed: 11/17/2015   Page: 14

the client to send the money owed to LPM Inc. to LPM Ltd., the Bermuda corporation, and the defendant did not report the income as his own. *Id.*[8]

In affirming the conviction, Judge Posner noted that "*Lucas* held that a taxpayer cannot escape *his* tax obligations by assigning income *that he has earned* to another person." *Id.* (emphasis added). In contrast, in this case Mary Vernon was not owed money for work she had not yet provided to contracting parties when RMS entered into those contracts. After the contracts were signed, then RMS earned the income paid to RMS by providing Dr. Vernon. Dr. Vernon's work for the third parties was done only after RMS entered into those contracts, and the nursing home or Atkins was contractually required to pay RMS, not Dr. Vernon.

These distinctions make a difference under the agency test adopted by the courts. And that was the theory followed by Ms. Lanning in advising the creation of RMS owned by Sara Wentz and having RMS contract to provide the services of Mary Vernon. The facts of *Newell* did not provide "fair notice" to Mary Vernon that the creation of RMS as advised by Jodde Lanning would put her on a path to prison.

With this ambiguity in the common law collection cases on assignment of income, this theory cannot be used consistently with due process to convict Mary

---

[8] Under these circumstances, Newell would not qualify for "the agency test" described above.

Vernon of tax evasion under the principles cited by the Supreme Court majority in

*Johnson v. U.S.*

**B.  Because RMS was not "a sham" under Kansas law, and Kansas does not authorize an "alter ego" finding against a person who is not an officer, director, or shareholder, the tax evasion statute does not provide fair notice to Mary Vernon that her conduct could be criminal.**

The civil cases cited by the government involving esoteric and complicated tax shelters, "sham trusts," and "UBOs" did not put Mary Vernon on notice that when she went to a respected corporate and tax lawyer—who taught as an adjunct professor at the University of Kansas Law School—and told the tax lawyer that she would like to segregate activities involving writing, speaking, and medical director service from her ongoing medical practice in order to protect those activities from potential medical malpractice claims; and she *did not* express an intent to evade taxes (APLT 978:14-979:7); and thereafter that the lawyer advised setting up a subchapter S corporation owned by Ms. Wentz to manage those activities; and then that subchapter S corporation was properly set up by the lawyer (APLT 979:24-980:2); and then that corporation (RMS) owned by Ms. Wentz contracted with businesses to provide the doctor for writing, speaking, and medical director work; and then payments were made to the corporation pursuant to those contracts; and then the doctor volunteered her services to RMS—then that is a criminal act.  But wait a minute—it's not even *that* simple.

10

For, as the Government argues on page 16 of its brief, RMS—the subchapter S corporation owned by Sara Wentz—was not "improperly formed in the first place." Appellee's Brief at 16. So RMS was not a "sham" when it was formed.

Rather, the Government now is trying on appeal subtly to shift away from the theory it presented to the jury under Instruction No. 8, now claiming RMS "essentially operated as a sham." *Id.*[9] So now the government concedes RMS was formed as a legitimate corporation; then RMS entered into legitimate contracts with legitimate contracting parties with the intention of making a profit; was paid real money pursuant to those contracts; made substantial profits; and, in 2003 and 2008, reported its income, as did its sole shareholder Sara Wentz. So where does the "sham" part come in under this government theory? *See Keller v. Comm'r*, 77 T.C. 1014, 1031 (1981), *aff'd*, 723 F.2d 58 (10th Cir. 1983) ("The policy favoring the recognition of corporations as entities independent of their shareholders requires that we not ignore the corporate form so long as the corporation actually conducts business.")

The government's position begs the question of exactly what event or activity made the operation of RMS "a sham" under governing Kansas law and when that occurred. Neither the prosecution's "theory" or the Court's instruction

---

[9] Note that this theory the government now advances is not reflected in jury instruction number 8, which mentions "sham entities," a "sham corporation," and "alter ego", but does not address "sham transactions." APLT 229-230; APLT 2437: 19-2440:3.

explained that to the jury, because the prosecution's trial position was that RMS was a sham because, according to the prosecution, RMS' income **was** Mary Vernon's income, and Dr. Vernon "controlled" Ms. Wentz because the President/sole shareholder/sole director of RMS gave her significant other electronic access to the RMS corporate bank accounts and to Wentz's personal bank accounts, and voluntarily signed checks prepared by Mary Vernon t pay the corporation's bills.

Preliminarily, the government glosses over the issue of what law applies to the "sham" and "alter ego" determination it pressed so urgently to sustain the conviction. The government barely mentions Kansas law for this determination, instead relying on the legal treatise Fletcher Cyclopedia of the Law of Corporations, citing *inter alia U.S. v. Scherping,* 187 F.3d 796 (8th Cir. 1999). But *Scherping* confirms that "[g]enerally, federal courts will look to state law to determine whether an entity is an alter ego of a taxpayer."187 F.3d at 802, *citing, inter alia, Aquilino v. U.S.* 363 U.S. 509, 512-13 (1960).[10]

---

[10] *See also Perpetual Real Estate Servs., Inc., v. Michaelson Props., Inc.*, 974 F.2d 545, 548-49 (4th Cir. 1992)(refusing to pierce corporate veil under Virginia law because "[t]he Supreme Court of Virginia has specifically held...that proof that some person 'may dominate or control' the corporation...is not enough to pierce the veil." "The fact that limited liability might yield results that seem 'unfair' to jurors unfamiliar with the function of the corporate form cannot provide a basis for piercing the veil."); *McCulloch Gas Transmission Co. v. Ks.-Neb. Nat. Gas Co.,* 768 F.2d 1199, 1200-01 (10th Cir. 1985)(undisputed "alter ego status alone is insufficient to pierce the corporate veil" under Wyoming law).

Thus, in the civil case at issue in *Schering* the Eighth Circuit looked to Minnesota law to find that the taxpayers created "sham entities… to evade payment of their federal income tax liabilities," *id.*, basing that conclusion on admissions made in the taxpayers' depositions and their criminal convictions. *Id.* at 803. To reach this conclusion, the Court applied Minnesota's "two-step analysis." *Id.* at 802. The government also cites a 2009 Minnesota Court of Appeals case—decided 10 years after *Scherping*, and after the relevant years of the indictment in this case—with the parenthetical ("whether a party holds an ownership interest in the entity is not dispositive"). Appellant's Brief at 43, citing both *Scherping* and *Equity Trust Co. Custodian ex rel. Eisenmenger IRA v. Cole,* 766 N.W.2d 334 (Minn. Ct. App. 2009).

Of what relevance is this 2009 Minnesota case decided years after RMS was formed and after Dr. Vernon's conduct? The government apparently offers it and includes the parenthetical in response to the undisputed fact that Mary Vernon was not a shareholder or an officer or director of RMS. The government is trying to imply to this Court that in 2003 the state of Kansas law on *alter ego* is identical to Minnesota law as announced by the Minnesota Court of Appeals in 2009.[11] The government is careful not to claim, however, that Kansas allows an *alter ego*

---

[11] The government also cites to a 2009 Colorado Court of Appeals case with the parenthetical ("mere existence or nonexistence of formal stock ownership is not necessarily conclusive"). Appellee's Brief at 43, *citing McCallum Family LLC v. Winger,* 221 P.3d 69, 75 (Colo. App. 2009).

finding against someone who is neither a stockholder nor an officer or director of the corporation claimed to be "sham."[12]

To the contrary, the government has not cited a single Kansas case that finds an individual who is neither a stockholder nor an officer nor a director of the allegedly "sham" corporation can nevertheless be its "alter ego."  But Kansas law is controlling.

In *Amoco Chemicals Corp. v. Bach,* 567 P.2d 1337, 1341-42  (Kan. 1977), the President/managing officer/principal stockholder of a corporation was held not liable under the *alter ego* doctrine.  *Bach'*s analysis summarizes Kansas law:

> We start with the basic premise that a corporation and its *stockholders* are presumed separate and distinct, whether the corporation has many stockholders or only one.  Debts of a corporation are not the individual indebtedness of its *stockholders.*  However, in an appropriate case the corporate form will be disregarded and the corporation and its *stockholders* may be treated as identical.  … Power to pierce the corporate veil is to be exercised reluctantly and cautiously.  …

> "The corporate entity may be disregarded where it is used as a cloak or cover for fraud or illegality, or to work an injustice, or where necessary to achieve equity.  When the corporation is the mere *alter ego* or business conduit of a person, the corporate fiction may be disregarded in the interest of securing a just determination of rights and liabilities."

> "The doctrine of *alter ego* fastens liability on the individual who uses a corporation merely as an instrumentality to conduct his own

---

[12] The only Kansas case cited by the government on "alter ego" is on page 42 of Appellee's Brief: "*Serv. Iron Foundry, Inc. v. M.A. Bell Co.,* 588 463, 673 [sic] (Kan. Ct. App. 1978)("Each case involving the disregard of a corporate entity must be decided upon its own special facts.")."  It is hard to believe the government claims that statement of Kansas law—that each case must be decided on its own facts—thereby put Mary Vernon on notice that her conduct would be found criminal 10 years later.

personal business, such liability arising from fraud or injustice perpetrated not on the corporation but on *third persons dealing with the corporation.* Under it the court merely disregards corporate entity and holds the individual responsible for his acts knowingly and intentionally done in the name of the corporation."

…[S]ingle ownership alone will not support the *alter ego* theory and justify a disregard of the corporate entity.

An examination of the cases discloses that some of the factors considered significant in justifying a disregard of the corporate entity are (1) Undercapitalization of a one-man corporation, (2) failure to observe corporate formalities, (3) nonpayment of dividends, (4) siphoning of corporate funds by the dominant stockholder, (5) nonfunctioning of other officers or directors, (6) absence of corporate records, (7) the use of the corporation as a façade for operations of the dominant stockholder or stockholders, and (8) the use of the corporate entity in promoting injustice or fraud.  There is no evidence in the present record to establish any of these factors.

567 P.2d at 1341-42  (Citations omitted; emphasis added).[13]  Of course, none of these factors were submitted to the jury in Instruction No. 8.  Yet this is the law that governed the issue of whether Mary Vernon was the alter ego of RMS under governing Kansas law.

---

[13] *See also, e.g., Kirk v. H.G.P. Corp.,* 494 P.2d 1087, 1089-90 (Kan. 1972)(majority stockholder was corporation's principal officer, director and manager of its affairs, and therefore was a fiduciary to its creditors when the corporation became insolvent); *Kilpatrick Bros., Inc. v. Poynter,* 473 P.2d 33, 35-42  (Kan. 1970)(President/director of three corporations (and sole stockholder of one) applied sale proceeds of corporate assets preferentially to the disadvantage of unsecured creditors; "To establish the alter ego doctrine it must be shown that *the stockholders'* disregard of the corporate entity made it a mere instrumentality for the transaction of their own affairs; that there is such a unity of interest and *ownership* that the separate personalities of the corporation and *the owners* no longer exist; and to adhere to the doctrine of corporate entity would promote injustice or protect fraud." (emphasis added)).

Appellate Case: 14-3279   Document: 01019524593   Date Filed: 11/17/2015   Page: 21

Thus, Kansas law does not support the assertion of *alter ego* to impose criminal liability on Mary Vernon in this case. Rather, an *alter ego* finding would impose criminal liability on Sara Wentz, the stockholder/officer/director who allowed the so-called "abuse" of the corporation she owned.

One final point before leaving the choice of law issue: According to the Fifth Circuit, "[t]he great weight of Texas precedent indicates that, for the alter ego doctrine to apply against an individual under this test, the individual must own stock in the corporation." *Bollore SA v. Import Warehouse Inc.*, 448 F.3d 317, 325 (5th Cir 2006)(citing Texas cases). Thus, in Texas, the fact pattern in this case could *not* be tax evasion, because Mary Vernon owned no stock in RMS; in Minnesota perhaps she could be convicted of tax evasion under Minnesota law as announced in 2009; and in Kansas she cannot be convicted, depending on an after-the-fact of all the relevant factors. But should a person's exposure to prison for federal tax evasion depend on where the defendant lives, what state's law applies, and how that state's courts have defined the standard of *alter ego* those states apply?

This illustrates the problem with the government's theory as applied in this case: the tax evasion criminal statute is unduly vague under the standards recognized in *Johnson v. U.S.* The tax evasion statute does not give the potential defendant clear notice of what conduct is illegal under the federal tax law under the

gloss of whatever state law is applied, including the *ex post facto* analysis of a differing number and variety of factors depending on which state's law applies.

The government acknowledges RMS was not a "sham" from the date of its incorporation. But it does not explain exactly at what moment the government claims RMS "became" a "sham" or an "*alter ego*" under Kansas law, and what conduct satisfied the standards set by Kansas law for "operating as a sham." And exactly how did the tax evasion statute provide Mary Vernon fair notice that RMS had "become" a "sham" under Kansas law, or her conduct had created federal income tax illegality under the Kansas law concerning "sham corporation" or the "*alter ego*" doctrine?

Did Mary Vernon start committing tax evasion when Sara Wentz, RMS' sole shareholder (APLT 2894-86), signed the contract with Atkins Medical (APLT 2903-11, 2912-20) (edited by the lawyer who set up RMS) to make Mary Vernon available to Atkins to write a book, and to speak on behalf of the Atkins diet? But signing that contract doesn't make RMS "a sham" under Kansas law, because Atkins was not defrauded or suffered any injustice by that contract.

Did Mary Vernon start committing tax evasion when Atkins or the nursing homes paid RMS pursuant to their contracts for the provision of Dr. Vernon's work? APLT 2788, 2808, 2809, 2849, 2883. But that payment doesn't make RMS

Appellate Case: 14-3279    Document: 01019524593    Date Filed: 11/17/2015    Page: 23

a sham under the eight factors cited in *Amoco Chemicals Corp. v. Bach,* 567 P.2d at 1341-42, under Kansas law.

Did Mary Vernon start committing tax evasion when RMS deposited the checks from Atkins and the nursing homes in the RMS bank accounts?  APLT 1741.  But that doesn't make RMS a sham under the factors cited in Kansas law, because the nursing homes and Atkins weren't defrauded, and didn't suffer any injustice.

Did Mary Vernon start committing tax evasion when Sara Wentz authorized Mary Vernon to draft checks drawn on the RMS bank account for Sara Wentz to sign?  APLT 1742:11-23.  Because there is no Kansas case holding that granting authority to a non-officer to draft checks to be signed by the President makes RMS a sham or Mary Vernon its *alter ego*.

Did Mary Vernon start committing tax evasion when Sara Wentz authorized Mary Vernon to access the RMS bank account electronically to transfer money to Sara Wentz's personal account?  APLT 1740:4-1741:2.  Because such authority doesn't make RMS a sham under Kansas law.

Did Mary Vernon start committing tax evasion when RMS filed its informational return for 2003 notifying the Internal Revenue Service of its income?  APLT 2767.  That informational return accurately described the facts, and did not defraud the IRS or cause the IRS any injustice.

Did Mary Vernon start committing tax evasion when Sara Wentz filed her 2003 tax return notifying the IRS of her subchapter S RMS income?  APLT 2721. Again, that filing was not fraudulent under the *Johnson* line of cases.

The point is that the Government has no coherent theory about what actions made RMS "operate as a sham" under Kansas law or made Mary Vernon an "*alter ego*" of RMS under Kansas law.  At best, the prosecution offered the vague theory that Mary Vernon "controlled" RMS, despite the undisputed fact that Sara Wentz was the S corporation's sole officer, director, and shareholder.

But then where does the tax evasion statute provide clear notice that someone who is not a shareholder, not an officer, and not a director; who is given authority by the President of a company to draft checks to be signed by the President and to transfer funds electronically from the company bank accounts to the President's personal bank account; where does the tax evasion statute make the company "operate as a sham" under Kansas law?  And where does the tax evasion statute address the presumption of Kansas law that a corporation with real business and reap profits the "*alter ego*" of a non-shareholder/director/officer under Kansas law?  There was no such notice.

None of the cases cited by the Government are criminal prosecutions of someone for following the advice of a respected corporate and tax lawyer to set up a mundane, run-of-the mill subchapter S corporation for a legitimate purpose that

is not tax evasion.  And the notion that the Government proved beyond a

reasonable doubt in its case-in-chief that defendant was put on notice that the plan

advised by Ms. Lanning was a path to prison is unsupported in the Government's

brief or in the prosecution's evidence at trial.

Accordingly, the trial court violated Mary Vernon's rights by denying her

motion for judgment of acquittal and by entering judgment on a conviction for tax

evasion.  The conviction should be reversed.

## II.  The Trial Court erred in denying Mary Vernon's motion for acquittal and in entering Judgment on a theory of tax evasion that could not have been known by the taxpayer and was not proved under Kansas law, and when the prosecution did not offer evidence that Mary Vernon knew that misapplication of civil tax collection doctrines developed in case law would be applied to her conduct.

All of the arguments presented in the first section of this brief apply with

equal force to the question of whether the government proved beyond a reasonable

doubt in its case-in-chief that Mary Vernon knew that her conduct constituted tax

evasion.  Moreover, the confusion surrounding the application of "assignment of

income" cases to personal service corporations; the government's concession that

RMS was not a sham from its creation; and the uncertainty surrounding when the

government contends the evidence showed RMS became a "sham" or Mary

Vernon became an "alter ego" under Kansas law defeats the notion that the

government proved beyond a reasonable doubt that a crime was committed here

under any of the counts of the indictment.

**III.  The Trial Court erred in instructing the jury with misstatements of civil tax collection doctrines that were not accurate statements of the law and were not clearly related by the Court to the tax evasion charges alleged in the indictment.  The instructions as a whole create substantial doubt that the jury was fairly guided and it is likely that the jury applied the instructions in an unconstitutional manner.**

As noted in Section **I** above, the government's new theory of an

"anticipatory assignment of income" was not mentioned in the jury instructions.

And as noted in the opening brief, the instruction as given by the trial court merely

made conclusory statements providing no guidance to the jury of the subtle

nuances of federal assignment of income case law, or the presumptive validity of

corporations under Kansas case law, the eight factors cited in *Amoco Chemicals*,

and the fact that an *alter ego* finding under Kansas law would make Sara Wentz the

*alter ego* of RMS, not Mary Vernon. Here is the totality of the Court's explanation

of the terms identified as critical by the prosecution:

> The use of sham entities to avoid tax liability is illegal.  Likewise, a taxpayer may not eliminate her tax liability by merely assigning income that the taxpayer earned to someone else, if the taxpayer maintains command over the income.

> It is your responsibility to judge the facts and determine whether Defendant Vernon improperly assigned her income to Rockledge Medical Services or Rockledge Medical Services was a sham corporation or alter ego of Defendant Vernon, thereby entitling you to ignore the existence of this corporation in determining whether the

Government has proved the existence of a tax liability due from Defendant Vernon.  To assist you in making this determination, I instruct you as follows:

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

… Thus, a corporation is not considered a separate entity for income tax purposes if it is merely a paper corporation, existing only to assist an individual to avoid taxation.

In addition, if a corporation is so controlled by an individual that it is being used by that individual to advance the individual's own personal purposes rather than to achieve corporate goals, the corporation is said to be merely the alter ego of that individual.  This is another way of saying that there is no separation between the corporation and the controlling individual.  When, for example, the controlling individual moves his or her own funds[14] in and out of a corporate account without any regard for which funds belong to the corporation and which belong personally to the individual, then a finding that the corporation is merely a sham corporation is proper.  The corporation is not to be disregarded, however, merely because an individual maintains a detailed direction of corporate affairs.

The failures of this instruction include:

--the Court's failure to acknowledge the presumptive legitimacy of the

creation of a corporation under Kansas law and the deference Courts should give to

the corporate form where the corporation actually conducts business. *Keller v.*

*Comm'r*, 77 T.C. 1014, 1031 (1981), *aff'd*, 723 F.2d 58 (10th Cir. 1983)("The

policy favoring the recognition of corporations as entities independent of their

---

[14] This reference begs the question of whether the income earned by RMS was its money, Sara Wentz's money, or Mary Vernon's money.  The Court's failure to define "assignment of income" allowed the jury to rule that legal question without guidance from the Court.

shareholders requires that we not ignore the corporate form so long as the corporation actually conducts business."); *Amoco Chemicals, supra;*

--When the corporation was created first, and then a written contract was signed to provide work, and that work is then performed, that income generated pursuant to that contract is not "an illegal assignment of income." *Schneer v. Comm'r*, 97 T.C. 643, 659 (1991)[15];

--the presumption of corporate legitimacy under Kansas law; the eight factors under Kansas law for establishing *alter ego* liability focused on the role of the stockholders, officers, and directors creating injustice to a third party, and not on the conduct of an unrelated individual. *Amoco Chems. Corp.*, 567 P.2d at 1341-42. *Cf. Perpetual Real Estate Servs., Inc., v. Michaelson Props., Inc.*, 974 F.2d 545, 548-49 (4th Cir. 1992)("The jury instruction in this case simply failed to communicate the essence of Virginia law in this area. Virginia adheres to a rigorous standard requiring proof that the defendant used the corporation to "disguise" some legal "wrong." This strict standard contrasts starkly with the rather soggy state in which the law was submitted to the jury. … The fact that limited liability might yield results that seem "unfair" to jurors unfamiliar with the function of the corporate form cannot provide a basis for piercing the veil.").

---

[15] Stating the issue this way illustrates why the case should never have been submitted to the jury; Mary Vernon's conduct was not illegal under the agency rule recognized in *Keller* and *Schneer*.

Overall, the instruction left the jury adrift to define for itself difficult concepts of sham corporations, alter ego, substance over form, and assignment of income--all difficult concepts that most judges find hard to grasp after years of legal training and experience.  This raises substantial doubt that the jury was fairly guided and establishes that there is reasonable likelihood that the jury applied the instruction in an unconstitutional manner.

**IV.  The Trial Court erred in its sentencing calculation by allowing the prosecution to ignore the legal existence of Rockledge Medical Services, Inc., and to allocate 100% of the net income of RMS and all of the tax on that income to Mary Vernon when her same-sex significant other Sara Wentz enjoyed the benefits of the arrangement; to claim $988,522.76 as "Tax Loss" when Dr. Vernon had paid in full all of her previous tax liability with full interest and penalties more than five years before the indictment was returned; and to employ a "sophisticated means" enhancement when the "Sham Corporation" doctrine does not apply under Kansas law.**

In addition to the arguments presented in Appellant's Brief, Dr. Vernon offers the following observation about the application of sentencing standards to this conviction.   Focusing on the failures in the prosecution analysis and its smorgasbord approach should convince the Court that the tax loss claimed by the government was substantially exaggerated.  The revised theory that RMS was not sham *ab initio* means that, even under the government's theory of the case, there was an unspecified time during the first years of the indictment when Mary Vernon was not committing a crime.

The uncertainty of that time period means that not all of the tax loss can be claimed for sentencing purposes, since the calculation assumed criminal liability from 2003 on.  The government's concession requires remand for recalculation of the sentence including only those portions of the time period when RMS was found to be a "sham" or an "alter ego"—which Mary Vernon submits cannot be determined from the jury verdict under the instructions as given.

Accordingly, the sentence should be reversed and the case remanded for resentencing.

## CONCLUSION

Mary Vernon's conviction should be reversed.  If the Court decides not to reverse the conviction, the sentence nevertheless should be vacated, and the case remanded for the IRS to recalculate the claimed "tax loss" so that Mary Vernon can be re-sentenced based on an accurate tax loss calculation.

Respectfully submitted,

/s/ Floyd R. Finch, Jr.
Floyd R. Finch, Jr.  KS. Bar #16993
Floyd Finch Law Offices
24211 E. Strode Rd.
Blue Springs, MO 64015
ffinch@kcbusinesstriallawyers.com
816-560-1234

Attorney for Defendant /Appellant

## CERTIFICATE OF COMPLIANCE WITH RULE 32(a)

1. This brief complies with the type-volume limitation of Fed. R. App. P.

32(a)(7)(B) because:

> this brief contains 6723 words, excluding the parts of the
> brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), and

2. This brief complies with the typeface requirements of Fed. R. App. P.

32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

> this brief has been prepared in 14-point type with Times
> New Roman font, using Microsoft Word for Mac 2011.

Date:  November 17, 2015

/s/ Floyd R. Finch, Jr.
Floyd R. Finch, Jr.  Mo. Bar #28377 Attorney
for Appellant
Floyd Finch Law Offices 24211
E. Strode Rd.
Blue Springs, MO 64015
ffinch@kcbusinesstriallawyers.com 816-
560-1234

## CERTIFICATE OF SERVICE

I, attorney for appellant, hereby certify that:

(1) all required privacy redactions have been made,

(2) any required paper copies to be submitted to the court are exact copies of the version submitted,

(3) the electronic submission was scanned for viruses on November 17, 2015, at 10:46 a.m. with Windows Defender, Virus Definition Version 1.209.3251.0, updated November 17, 2015, at 8:58 a.m., and is free of viruses, and

(4) on November 17 2015, I served a copy of Appellant's Reply Brief to Frank P. Cihlar, Katie S. Bagley, Gregory V. Davis, and Matthew J. Kluge of the U.S. Department of Justice, and D. Christopher Oakley, Assistant U.S. Attorney for the District of Kansas, Counsel for Appellee, by electronic filing.

/s/ Floyd R. Finch, Jr.
Floyd R. Finch, Jr.